Good morning everybody. Our first case for argument is SprintCom v. Sheahan. Mr. Schenkenberg. Good morning. May it please the Court. My name is Phil Schenkenberg and I represent the appellants in this case, which are Sprint wireless operating entities within the state of Illinois. This case arises out of an interconnection arbitration proceeding that was conducted by the Illinois Commerce Commission under the procedures in the 1996 Telecommunications Act. In that case, the Illinois Commission resolved issues and established terms of a contract, an interconnection agreement that would govern the way in which Sprint's wireless entities and AT&T's landline telephone company connect their telecommunications networks and then exchange calls. On appeal here, Sprint asks this court to reverse the commission and the district court on three legal issues. There's a very arid quality to the briefs in this case. There's absolutely nothing in the briefs about the stakes, about prices, about economic conditions, whether there's a natural monopoly problem. For example, when you have a Sprint caller and the person on the other end is not an AT&T customer but AT&T's facilities are used for part of the transmission, you want to have this very low price that you'd have when the You don't say anything. What is the price difference? What are the economic consequences for Sprint? What are your alternatives? Do you have a case for monopolization by AT&T or do you have alternatives? Can you build your own facilities, your own transmission facilities to reach those customers? Is there anything in the record about these? Your Honor, the differences between prices I don't believe is in the record, but the stakes are important and Well, how do we know they're important when there are no numbers? As far as I understand, AT&T says there is no price difference. AT&T says its normal prices are the prices that would be set under this TELRIC rate. I believe that to be incorrect and I don't understand that to be AT&T's position. What is undisputed is that if Sprint is entitled to, if Sprint is using these particular links, these links between the AT&T switch and Sprint's switch for interconnection, for purposes allowed under Section 251C2, then it gets the lower rates set by the Commission under the cost methodology Just for the purpose of interconnection? Yes. That's the whole thing of Talk America. This case isn't about interconnection, it's about the traffic that's going to be carried. Your Honor, this case is about interconnection. Section 251C2 requires state commissions to provide competitors like Sprint with interconnection to facilitate the transmission and routing But the question is the meaning of interconnection and it would help me anyway to have some sense of what the stakes are. Part of the reason, Your Honor, that that's not in the record is this case didn't involve pricing of those facilities. The parties came in and agreed that the prices previously set by the Commission under that cost methodology, the FCC's total element long run incremental cost methodology, wouldn't be changed. They would be as they were set in the prior cost docket. So there weren't cost experts, there wasn't testimony on that, but there is a difference in those costs between Well, what if it's 1% difference? I don't understand. If it were 1% difference, the parties wouldn't be here. Okay, so what is the difference? I don't know, Your Honor. So how do you know it's not 1%? Because the parties are fighting in multiple states about whether But I don't know why the parties are fighting, right? There could be a lot of reasons for parties to be fighting apart from the economic stakes. Your Honor, the parties have decided amongst themselves that the difference in these rates is significant enough to make it an arbitration issue here in Illinois and in other states. I apologize for not knowing what those rate levels are. Do you know anything about the economic circumstances and consequences of the issues you've raised? From a dollars and cents standpoint, I don't and it's not in the record. What I do know, Your Honor, is that So take your third issue about, okay, you have this postage stamp pricing, right? Everybody in the United States is charged the same. So by doing that, you are charging less to your customers. At the same time, you are hoping by doing this that you get a lower rate from AT&T. But you don't tell us, what is the offset here? Is the lower rate you seek from AT&T enough to make your reduction in the price to your nationwide customers smaller than the reduction in cost that you're paying, right? Your Honor, the rates to be paid under AT&T's access tariff are, I believe they're in, I think they're incorporated into an attachment to our complaint where there are per minute rates that were copied over from the tariffs into the interconnection agreement. It's in the order of a penny a minute or some portion of a penny a minute compared to zero per minute because under the FCC's rules, if it's not an access charge But you're going to pay more to AT&T, right? If the commission By virtue of treating all your, I'm sorry, you're going to be charging less to your customers by treating all your calls as local calls. Isn't that correct? It's not, Your Honor. What gets charged to customers is determined by the marketplace. Sprint will pay less to AT&T if Sprint's position is accepted. But what's important I understand you want to pay less to AT&T, but I thought you were also charging less to your customers because you're treating all your calls as local rather than long distance. Well, the market bears what the market bears, and what the FCC did many years ago in the 90s was say that it was going to let carriers and their customers decide what customers wanted within their service plans and let the market set rates, and that's what's happened. Customers want to buy plans that have unlimited local calling throughout a nationwide calling area. So that's what drives the calling area, and then rates are determined by the market. That's a different question from whether AT&T is allowed under the FCC's new pricing rules established in 2011 to assess charges on any particular kind of call. That's an FCC rule question, not an economics question, not a question about whether Sprint is going to do better or worse or how much better. That's a question of the interpretation and application of an FCC rule in light of the statutory terms that existed when the FCC adopted that rule. And the AT&T and the Commission concede that if you use those words, read those words in conjunction with the statute, that exchange access, which is the clause the FCC used in its new rules, ties back to the term telephone exchange service, which requires a separate charge. That means that calls without a separate charge aren't within the scope of that rule, and the new rule does not impose compensation obligations on Sprint for delivering that call. What do you mean by separate charge? A separate charge. Most of us in the room remember we're talking about a call in Issue 3, for example, from St. Louis to Chicago. A Sprint wireless customer makes a call in St. Louis. It goes on to the Sprint wireless network. Sprint delivers it on its own network up to Chicago, hands it to AT&T, and AT&T delivers it to an AT&T landline telephone customer. That's the kind of call we're talking about. Most of us in the room remember when that kind of call, if you were going to call St. Louis to Chicago, it was $0.05 a minute, $0.08 a minute, $0.10 a minute. You knew you were going to pay a separate charge for every minute you were on the phone. That's what a separate charge is. That's what makes a call a telephone toll service call under the statute, and we just don't have that in the wireless industry today. As I said before and as was undisputed of. Why does that change the meaning of the statute? There are, I suppose, two ways to read the statute. One is that it would refer to things that were telephone toll calls in 1996, and the other is that it refers to things that are telephone toll calls now. You obviously favor the latter reading, but why? Has the FCC adopted regulations saying the latter reading is the only permissible one? The definition has not changed. No, there is no definition in the statute. I'm asking a temporal question. The statute might mean the market as it was structured in 1996 or the market as it's structured as of the time of a dispute. The statute doesn't tell you which of these two things is right. Has the FCC adopted regulations saying which of these two things is right? What the FCC has done, Your Honor, is to indicate in its orders that it understands that telephone toll service is provided by wireless carriers when calls are delivered outside of a home calling area, which is our position here. So your answer to my question is no, it hasn't adopted any such regulation. Your Honor, it has not. Again, we would submit that the definition of telephone toll service in the statute is sufficient to accomplish that purpose. There is no definition in the statute. Telephone toll service? About my question, about what the temporal framework is. Thank you, Your Honor. Say, before you sit down, going back, I'll give you a chance for rebuttal if you like. So, with regard to the first question, so you don't like having to, you obviously don't like having to go through the AT&T lines if you have to pay, if you don't get this TELRIC rate. So what alternatives do you have? There are a lot of carriers. It's not just AT&T. It doesn't have a national monopoly anymore. Your Honor, if Sprint, just like any other competing telephone company, wants to indirectly interconnect with all of the other carriers in the area, the dozens and dozens and dozens of carriers within the Chicago area, and to do so at parity with AT&T, it has to use AT&T's switch in some circumstances to connect to those other carriers. And that's what this is about. So you're saying AT&T's line is indispensable to you for some calls? Indispensable is the wrong word. To be at parity with AT&T? No, no, that's not my question. Do you always have to use AT&T? Are there some calls for which you have no alternative to using AT&T? These are calls to people who are not the AT&T customers. Sprint could always choose to connect to long-distance carriers directly rather than indirectly. That would be more expensive, and we'll put Sprint not yet. Why would it be more expensive? Because you're establishing maybe 20 separate direct connections instead of one hub-and-spoke connection, a spoke to AT&T, and then let AT&T distribute. Okay. Well, thank you, Mr. Shankenberg. Mr. Gurman? Good morning. May it please the Court. I'm Hans Gurman. I represent AT&T. With me at the table is Matt Harvey from the Commerce Commission, but I'll be presenting the argument today for the Appleese. I'd like to start by briefly addressing the first question that the Court asked Mr. Shankenberg. I, too, have to admit that I do not know the precise price differentials at stake here because those are not in the record, but there are differences, and that is why the parties are fighting these issues. I have a related question about why you're fighting, which is since, under Talk America, the TELRIC rates are limited to the link-up and AT&T can charge whatever its tariff price is for the actual traffic, why does AT&T effectively want less traffic? AT&T doesn't claim to be a monopolist, and Sprint's lawyer just said that AT&T is not a natural monopolist. It can connect directly. So why doesn't AT&T want to maximize its traffic for which it can charge? Well, I don't believe Sprint, my client doesn't believe that Sprint's position would maximize traffic and revenue in particular. Currently, I should say currently, under the party's prior interconnection agreement, Sprint had the option to, and in some cases it did, purchase these same facilities at tariff rates, and the tariff rates are significantly higher than the TELRIC rates. I don't know exactly what the difference is, but TELRIC rates are, the Supreme Court described them as near-confiscatory. They are really as low as you. Near what? I'm sorry? Describe them as what? Near-confiscatory. Just above the level of confiscatory rates. That's how they are set. So in virtually all circumstances, it's safe to say that tariff rates are somewhat higher, and that includes the case in the last issue on appeal here relating to access charges for inter-MTA traffic. Sprint's position is that there should be no compensation, the rate should be zero, and as Mr. Schenkenberg suggested, the tariff terminating access rate is on the order of maybe a penny per minute, maybe a fraction of a cent per minute, but when you're talking about a company the size of Sprint, there will be millions of calls and millions of minutes. So those numbers do add up. Similarly, on the entrance facility issue, today Sprint purchases some facilities from AT&T's tariff and pays tariff rates, and what Sprint wants now is to buy those facilities at Telerik rates, which are significantly lower, and AT&T's position is in light of Talk America, that's fine, but pursuant to Talk America, pursuant to the FCC's amicus brief, and pursuant to this court's decision in box, you can only use those facilities if you purchase them at AT&T. Are those tariff rates regulated? They are. Can Sprint complain to the FCC that they're monopoly prices? Yes, they can. Have they done that? Not to my knowledge. Interstate tariff rates are subject to the 34 Communications Act provision, which states that all rates, all tariff rates, must be just and reasonable, and every carrier who purchases facilities from a tariff, facilities pursuant to a tariff, can always complain to the FCC that the rates are not just and reasonable. Addressing one other point that was raised, the FCC has not adopted any regulation that specifies a temporal framework for determining whether traffic is toll or whether traffic is exchange access, but what the FCC has done is it has consistently drawn a line between local traffic and inter-exchange traffic, which in the wireless context, the FCC ruled in 1996, means intra-MTA traffic or inter-MTA traffic. Since 1996, there have been great changes, including the wireless industry, including more carriers going to flat-rated plans that are maybe nationwide, and the FCC, in light of all that, has never come back and changed its intra-MTA rule. Were these obsolete, the present rules, obsolete? I don't think the present rules are obsolete. I agree. I think the FCC, in its most recent compensation order in 2011, the Connect America order, the FCC adopted new rules capping and reducing access charges over time. So those access charges will go away. But in the meantime, for that transitional period, the FCC said we are going to retain our intra-MTA rule, meaning we are retaining the distinction, the bright line distinction, between intra-MTA traffic and inter-MTA traffic. Is there something about an end user? There was some concern here about an end user versus something external. I don't understand that. Yes, the end user relates to the entrance facility issue, and the Supreme Court, relying on the FCC amicus brief, said entrance facilities are available at low teller rates when used for purposes of interconnection. And courts have described the purpose of interconnection as the mutual, well, the FCC has defined it as the mutual exchange of traffic. And the courts have explained that the purpose of interconnection is so that the competitor and the incumbents, end users, can call one another and communicate with one another. And that's distinguished between when Sprint wants to use AT&T's network solely as an intermediary to reach customers of some third party. Well, that seems to me where the dispute is, actually. I don't understand it. I'll be blunt about it. But it seems that that's the problem. When you can bypass and go on somewhere else, you should pay more. That is the key dispute regarding entrance facilities. What is the logic of the distinction? The logic of the distinction is that the fundamental purpose of interconnection is so that if a competitor cannot interconnect with the incumbent so their customers can make calls to the incumbent's customers and vice versa, it would be extremely difficult for other companies to compete with the incumbent. Because nobody wants to sign up for a competitor service that says you can make calls except to customers of AT&T Illinois because we can't interconnect with them. Well, but isn't that a matter of the rates? AT&T would be happy to provide the interconnection at a, as you say, a tariff rate, which would have to be just and reasonable. They would, but really to jumpstart competition in the act, certain things have to be provided to competitors at cost-based rates, which the FCC enacted regulations saying that means TELRIC, which is a different... So this is sort of a gift to Sprint? Well, in our view, that's one way of looking at it. I mean, historically, I think in the utility context, there never was a pricing methodology like TELRIC. It's based on a hypothetical network built today using the most efficient technology, and it really does not take into account actual costs and historical costs. So it really is as low as it gets, and I think the Supreme Court was right. It's near-confiscatory. Now, that may make sense when you want to jumpstart competition and a competitor needs to interconnect with the incumbent to exchange telephone calls, but that's not the case when you're talking about a third-party inter-exchange carrier. So you're saying AT&T is forced, in effect, to subsidize a competitor? Well, many of the incumbents certainly disagree with the TELRIC pricing methodology and view it as subsidization, but I don't think we have to go that far here. Regarding the entrance facilities, Sprint's position is that, well, basically their position is anything we want to send to AT&T through their switch to use their network for is interconnection, and I'd just like to point out, I think that's totally inconsistent with what this court said in the Box case. If one Sprint customer calls another, is that subject to the, does that have to go through TELRIC, or does Sprint communicate directly with its own customers without going through an AT&T facility? That is a clear case of backhauling for which our position is the Illinois Commerce Commission held. You cannot use TELRIC-priced entrance facilities. It's an extraordinary use of the word backhauling. Backhauling usually means you send a truck full of stuff, and you'd like, ideally, to utilize the truck to bring something back, so it's used for both legs of the journey. Backhauling in telecommunications appears to have nothing to do with that. I don't understand where the word comes from. I would agree with that. I think it is a somewhat strange use of the term, and I cannot tell you where it comes from. Sprint, in its brief, uses the word intermediary service, and I think that is perhaps a fair way to characterize it because the distinction is they want to use AT&T's network solely as an intermediary to get traffic from Sprint to some third party, and that's, in a sense, backhaul, because they're not trying to exchange traffic with AT&T's end users. They just want to haul the traffic from point A to point B using AT&T's network. It isn't a backhaul. It's a forward haul. It depends on which way the traffic is going, I guess. But I'd point out in the Box case, the court did acknowledge the distinction between backhauling and interconnection, and I think the court acknowledged there that it's a somewhat strange use of the term, but the FCC has used it in its amicus brief in the Talk America case, and the Supreme Court deferred to the FCC's interpretation of how its rules apply to entrance facilities in that context. In the amicus brief, the FCC said that entrance facilities must be made available for interconnection at cost-based rates, even though they need not be made available for other purposes. The Supreme Court picked up on that distinction and reiterated that entrance facilities leased under 251C2, which means at teller prices, can be used only for interconnection, and that's entirely consistent with the Box case where this court distinguished between backhauling and interconnection and said SELEX, under the Commerce Commission's order that was affirmed, in that case can use entrance facilities exclusively for interconnection. So we don't dispute, and actually the ICA language at issue here certainly permits Sprint to obtain entrance facilities at Tellerick when Sprint wants to exchange traffic with AT&T's customers or AT&T's end users. The only limitation is that Sprint cannot use facilities at those rates, at Tellerick rates, when it wants to deliver traffic to a third-party IXC. And that example is really no different than the example that this court gave in the Box case of backhauling for which entrance facilities cannot be used. The court gave, as an example, intra-SELEC traffic. Intra-what? I missed that. SELEC, competitive LEC. If you would avoid acronyms that only specialists use, you'll have an easier time talking to us generalists. Yes, sir. Yes, sir. Intra-competitive local exchange carrier. So those are local exchange carriers other than the incumbent competing with the incumbent carrier. That itself is specialized jargon because everybody, AT&T, Sprint, they're all incumbents and have been for a generation. What you're referring to when you refer to incumbent is the descendants of AT&T before the consent decree, which is, well, a long time ago. It has been a while now, yes. So really, here in the area, we're talking about AT&T Illinois, Illinois Bell is the incumbent. Competitive carriers are the newer, though it's 20 years plus now. But these days they're all competitive carriers and they're all incumbents. We aren't dealing with new entrants here. Sprint is not a new entrant. That is correct. Language suitable to a discussion in the 70s doesn't illuminate in 2015. Yes. I use the term incumbent because it is part of the statute. So under Section 251, in particular, 251C2, which is the interconnection duties we're dealing with, are specifically directed at what the statute calls incumbents. I see I'm out of time. Okay. Well, thank you very much, Mr. Germer. Thank you. Mr. Schneckenberg? Anything further? Very briefly, if you would, from the economic standpoint and the competitive standpoint, if you were in competition with AT&T and AT&T has a switch and AT&T is already connected to the 50 or 75 carriers in the area, would you feel at parity with AT&T if you had to connect directly with every one of those as opposed to going through AT&T's switch and allowing AT&T to be the intermediary? Okay, so you want to go through AT&T. That's fine. Have you challenged their tariff rate as being unjust and unreasonable? That has not been done because it's not necessary. Because it's not what? It's not necessary. Well, I don't understand. If these facilities, as a matter of federal law, have to be provided under Section 251C2. But that's very murky, right? It's very unclear. So I think, you know, you'd want to show that there is a reason for interpreting the statute the way you want to interpret it, the reason being that these rates are excessive, that AT&T charges. Thank you, Your Honor. Sprint relied on the 251C2A and has not relied on the just and reasonable provision that would apply to purchase of facilities out of federal tariffs and not under 251C. Thank you. Okay, well, thank you very much to both counsel. Our next case for argument is Lee.